## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| AMY STANCZYK, | | |
| | Plaintiff, | No. 1:15-cv-00097-LRR |
| v. | | **FIRST AMENDED COMPLAINT** |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | | |
| | Defendant. | |

NOW COMES the plaintiff, Amy Stanczyk, through her Attorneys, Alan C. Olson & Associates, S.C., by Alan C. Olson, and, as and for a First Amended Complaint against the defendant, The Prudential Insurance Company of America, amends the allegations of the original Complaint, set forth in bold-lettering as follows:

### NATURE OF THE CASE

1.      This is an action brought by the plaintiff, Amy Stanczyk, ("Ms. Stanczyk,") under Iowa common law against the defendant, The Prudential Insurance Company of America, ("Prudential") to redress the injuries inflicted on Ms. Stanczyk by Prudential when it refused in bad faith to pay her benefits pursuant to a Group Long-Term Disability Plan.

### PARTIES

2.      Ms. Stanczyk is an adult who resides at 2025 Diamond Ridge, Cedar Rapids, IA 52403.

3.      Prudential is, upon information and belief, a wholly-owned subsidiary of Prudential Financial, Inc., and provides life and disability insurance to the public. Prudential is

Ext. A

engaged in an industry affecting commerce, and has had significant and continuous business contacts throughout the State of Iowa. Prudential has corporate offices located at 751 Broad Street, Newark, New Jersey 07102.

**DEMAND FOR JURY TRIAL**

4.      Ms. Stanczyk demands that her claims be tried to a jury of her peers.

**COMMON ALLEGATIONS**

5.      Prudential offered a group long-term disability insurance plan ("the Plan") to the members of the American Institute of Certified Public Accountants or a qualified State Society.

6.      Ms. Stanczyk was a member of the Wisconsin Institute of Certified Public Accountants and an insured under the Plan issued by Prudential to JPMorgan Chase Bank, as Trustee for the American Institute of Certified Public Accountants Insurance Trust as the contract holder.

7.      Ms. Stanczyk held a current certification as a Certified Public Accountant ("CPA"), Wisconsin license number 11205.

8.      Ms. Stanczyk worked as a CPA/Independent Consultant for over 10 years, most recently self-employed under contract to Milwaukee County.

9.      Ms. Stanczyk's occupation required her to maintain high levels of concentration for extended periods of time performing complex tasks. Ms. Stanczyk's tasks included complex analysis, research, application, testimony, written and oral communication with executives, and long meetings.

10.      Ms. Stanczyk worked on-site in her client's offices and could not control the temperature, lighting or her proximity to a bathroom. Ms. Stanczyk's tasks were time-sensitive and required extended workdays at times.

2

11.     Ms. Stanczyk's work as a sole-practitioner was held to a high level of professional standards and exactitude. Inaccuracy in her work would constitute malpractice rather than simply a correctable mistake. Unlike CPAs employed in a public accounting firm, Ms. Stanczyk had no one else that supervised or reviewed her work. There was also no one who could take over for her when she became incapacitated.

12.     The Plan defines Total Disability on page 8 of the Plan as follows:

"Total Disability" exists when Prudential determines that all of these conditions are met:

(1) Due to Sickness or accidental Injury, you are not able to perform, for wage or profit, the material and substantial duties of your occupation.

(2) You are not working at any job for wage or profit.

(3) You are under the regular care of a Doctor.

13.     As of June 6, 2006, Ms. Stanczyk started to experience nausea, profuse sweating, weakness and a series of dizzy spells, especially when moving from one position to the next.

14.     On November 17, 2006, Ms. Stanczyk's treating neurologist, Dr. Alex Barboi, conducted a series of objective tests and diagnosed her with primary autonomic dysfunction. Small fiber neuropathy and postural orthostatic tachycardia syndrome (POTS) are part of the dysfunction.

15.     Dr. Barboi confirmed that Ms. Stanczyk's symptoms from POTS are an abnormally large increase in heart rate upon standing, lightheadedness, chronic fatigue, vision disturbances, migraines, nausea, headache, tachycardia, palpitations, chest pain, exercise intolerance, shortness of breath and impaired concentration.

3

16. Dr. Barboi assessed Ms. Stanczyk's small fiber neuropathy as causing pain in her hands, feet, and throughout her body, which substantially impairs her ability to walk, hold things, or type on a computer keyboard for more than an hour at a time. Chronic pain also impacts her ability to sustain concentration, he states. In addition, other autonomic functions of the body, including digestion, sweating, flight-or-fight responses and respiration are impacted. Dr. Barboi specifically noted that Ms. Stanczyk suffered the side effect of mental fogginess from the Topamax she was prescribed from November of 2006 through June of 2007.

17. Dr. Barboi has concluded from his studies, interviews, and examinations of Ms. Stanczyk that her disability, which is chronic, non-curable, and unlikely to improve, prevents her from doing her job. Dr. Barboi concluded that Ms. Stanczyk is significantly debilitated by their symptoms and her symptoms are amplified by stress.

18. Ms. Stanczyk suffers from an array of conditions that have similar, and sometimes overlapping, symptoms, including Autonomic Dysfunction, Postural Orthostatic Tachycardia Syndrome ("POTS"), Neuropathy, Trigeminal Neuralgia, Ehlers-Danlos Syndrome, Chronic Pain, Migraines, Chronic Fatigue, Fibromyalgia, and Low Back Pain. Some of these conditions, such as the autonomic dysfunction and POTS, intersect or are interrelated, if not in fact caused by one another. Gastrointestinal symptoms associated with Ms. Stanczyk's conditions include fecal and urinary incontinence, nausea, vomiting, and constipation.

19. Ms. Stanczyk suffers numerous physical problems as a result of her medical conditions which, in concert, ultimately caused her to be unable to perform, for wage or profit, the material and substantial duties of her occupation as of 2006 through the present time.

20. **On January 19, 2007, Prudential acknowledged that Ms. Stanczyk's claim for benefits was submitted and sent Ms. Stanczyk the necessary forms to complete.**

4

21.     As of February 6, 2007, Prudential knew the names of all of Ms. Stancyzk's treating doctors, Drs. Pryba, Keri-Graf, and Barboi.

22.     On February 13, 2007, Ms. Stanczyk returned her Attending Physician Statement ("ATS") from Dr. Barboi and medical authorization forms. The ATS explained that: Ms. Stanczyk's last day worked was March 20, 2006 and the first day of her treatment was November 17, 2006; Ms. Stanczyk was a CPA and her job requirements were classified as "light" where she had to lift up to ten pounds frequently, twenty pounds occasionally, frequent walk, stand and/or constant push/pull; Ms. Stanczyk presented various conditions: dysautomia, small nerve neuropathy, postural or thostatic tachycardiac syndrome; Ms. Stanczyk had chronic fatigue, needed 10 hours of sleep and naps, cognitive impairment, pain, and visual impairment; Ms. Stanczyk's primary care physician ("PCP") was Dr. David Pryba with Dr. Keri-Graf for neuro-opthalmology; Ms. Stanczyk had a primary diagnosis of autonomic nervous system disease with secondary diagnosis of small fiber neuropathy, postural orthostatic tachycardiac syndrome; and detailed the onset of conditions starting November 17, 2006 as orthostatic symptoms, chronic fatigue, frequent near syncopal episodes, LE pain, visual disturbances, and cognitive impairment.

23.     On or about January 19, 2007, Prudential acknowledged Ms. Stanczyk's application for long-term disability benefits under the contract with Prudential.

24.     During the application process, Ms. Stanczyk submitted complete medical documentation and verification of her disabling medical conditions to Prudential.

25.     On February 22, 2007, Prudential sent Ms. Stancyzk an unnecessary form letter reminding her that in order for a claim to be filed they needed the forms it already

had. The letter also contained a warning about fraud and did not identify the sender other than Prudential Financial.

      26.      **On February 27, 2007, Prudential ordered the records of Drs. Pryba, Keri-Graf, and Barboi.**

      27.      **On April 4, 2007, Kristin Lacetti, a manager for Prudential, sent a letter to Ms. Stanczyk requesting an extension of time to get the records of Froedtert Hospital.**

      28.      **Prudential received the records from Froedtert Hospital on May 4, 2007. Registerd Nurse Carrie Eccles reviewed the file and recommended a full file workup.**

      29.      **Ms. Eccles's recommendation led to internal file reviews on May 11 and 22, 2007 by Registered Nurse Caroline Fahey Migueis, who concluded that the medical review did not support an impairment from at least full-time sedentary work. Fahey Migueis picked isolated portions of the record to support a denial and failed to analyze** Ms. Stancyzk's **entire record and conditions.**

      30.      **Dr. Albert Kowalski, an employee of Prudential, reviewed the subjective, objective, assessment, and plan ("SOAP") notes, agreed with Ms. Fahey Migueis without making a full and fair review, and referred the claim to Ms. Laccetti for denial.**

      31.      On or about May 24, 2007, Prudential denied long-term disability benefits.

      32.      **On June 7, 2007, Ms. Stancyzk requested the claim documents for the appeal process.**

      33.      **On July 27, 2007, 50 days after she had requested them, Prudential sent Ms. Stanczyk the claim documents for the appeal process.**

      34.      **On November 19, 2007, Ms. Stanczyk wrote Prudential advising that Dr. Barboi was writing a report and requested an extension of 30 days. The letter also pointed**

out that Prudential had not sent all the requested information, such as emails, log entries, communications with vendors, etc.

35.     On November 29, 2007, Ms. Stanczyk sent authorizations for the release of SOAP notes and other communications, which were received on December 4, 2007.

36.     On or about December 20, 2007, Ms. Stanczyk appealed Prudential's termination of her benefits. In her appeal, Ms. Stanczyk included the affidavits of herself, her husband Tom Stanczyk, personal trainer Dawn Breuer, and former work contact Scott Manske, her job description, Dr. Barboi's report, and a June 19, 2007 Neuropsychological Evaluation.

37.     On January 3, 2008, Prudential sent Ms. Stanczyk a letter indicating that the determination on the appeal would be made by February 2, 2008.

38.     In a SOAP note from January 4, 2008, Celeste Kolodin, who was handling Ms. Stanczyk's appeal, acknowledged the need for raw data and indicated Prudential would request the data from Ms. Stanczyk. No action was taken on the raw data request until Ms. Stanczyk submitted an authorization for release of raw data on January 17, 2008.

39.     Ms. Kolodin did not request current records from Ms. Stanczyk's treating physicians, and as such, Ms. Stanczyk's medical records since April 20, 2007 were not part of the claim file.

40.     On January 8, 2008, in response to Prudential's January 3 letter, Ms. Stanczyk submitted an affidavit of her friend Linda Henika who described Ms. Stanczyk's conditions and their impact on her (Ms. Stanczyk).

41.     On January 29, 2008, Ms. Kolodin wrote Ms. Stanczyk explaining she needed raw data and financial information. Ms. Kolodin indicated that Ms. Stanczyk had 45 days

7

to submit the information and Prudential would require 45 days from the date submitted for a decision.

42.     **On January 31, 2008, Ms. Stanczyk provided Prudential with the requested** authorization form and financial information.

43.     **On February 5, 2008, Prudential claimed it needed another 45 days to issue a** decision.

44.     **On February 5, 2008, Prudential hired Psybar to perform an independent** review of Ms. Stanczyk's claim.

45.     **On February 12, 2008, Prudential sent a letter to Ms. Stanczyk asserting that** it was her responsibility to make sure the raw data was sent to Prudential by March 18, 2008. Ms. Stanczyk had already provided authorization for the raw data prior to Prudential's letter.

46.     **On February 20, 2008, Prudential received the raw data.**

47.     **On February 28, 2008, Prudential received a report from Nick Defilippis,** PhD, regarding his neuropsychological file review of Ms. Stanczyk's medical records. Mr. Defilippis's file review also contained affidavits sent by Ms. Stanczyk and her December 20, 2007 and January 14, 2008 letters as well as Dr. Bobholz's June 2007 report. Mr. Defilippis concluded that: Ms. Stanczyk had no cognitive impairments from September 13, 2006 forward and that the neuropsychological report of June 2007 was normal; Ms. Stanczyk's subjective complaints of impairment were related to psychological issues; Ms. Stanczyk may present with underlying anxiety and depression or stress caused by a number of factors; these conditions could cause Ms. Stanczyk to believe she was more functionally

8

impaired than she was; and that Dr. Bobholz had recommended psychotherapy, but she had not done so per her letter.

48. **On March 4, 2008, Prudential requested that MLS do a record review and that Psybar set up a psychiatric independent medical exam ("IME"). Prudential scheduled psychiatric IMEs with Dr. Robert Loiben for March 25, 2008 and April 9, 2008.**

49. **On March 11, 2008, Ms. Stanczyk's attorney, Alan Olson, objected to the IME dates because they were scheduled for after the March 18, 2008 appeal decision deadline. Attorney Olson asked for policy language permitting the IME appointments and the tolling of the deadline.**

50. **On March 13, 2008, Prudential responded to Attorney Olson, but the letter did not provide any relevant policy language.**

51. **On March 18, 2008, Prudential admitted that no such policy language existed.**

52. **In late March 2008, several letters were exchanged between Attorney Olson and Prudential, with Attorney Olson requested that a decision be made on the record. Prudential refused to do so without the IME.**

53. **On March 26, 2008, MLS sent its neurological review signed by Dr. Steven McIntyre and concluded that Ms. Stanczyk should be able to function in most capacities neurologically, but she did have an impairment and work restrictions from September 13, 2006 forward and through and beyond December 12, 2006 because of the risk of syncopal episode.**

54. **On April 3, 2008, Ms. Stanczyk agreed to the IME, which was set for May 23, 2008 with Dr. Donald Feinsilver.**

9

55.     Prudential took no action to obtain an IME from any other doctors for purposes other than psychiatric evaluation.

56.     On April 10, 2008, Ms. Kolodin discussed Dr. McIntyre's report with Manager Andrea DeGroot and they decided that Ms. Stanczyk could perform her job. The SOAP notes offered no explanation for Mses. Kolodin and DeGroot's decision, nor did they indicate why more weight was given to the file review over that given to the opinions of Ms. Stanczyk's multiple treating doctors. Medical records from treating physicians after April 20, 2007 were not obtained so were not part of the review.

57.     On April 17, 2008, the Social Security Administration ("Social Security") requested all of the medical information of Ms. Stanczyk possessed by Prudential. Social Security sent a follow-up letter on May 16, 2008, as Prudential had failed to reply.

58.     Prudential sent 30-day letters on April 29, 2008 and May 29, 2008 indicating a determination on Ms. Stanczyk's appeal would be made by June 24, 2008.

59.     On May 30, 2008, Dr. Feinsilver submitted his report to Psybar, concluding: Ms. Stanczyk suffers from adjustment disorder; Ms. Stanczyk is not psychiatrically disabled from her work; Ms. Stanczyk is not cognitively impaired; Ms. Stanczyk's work capabilities depend on her physical condition and the impairment imposed by her autonomic dysfunction. There was no indication of symptom magnification.

60.     On June 3, 2008, Prudential sent Ms. Stanczyk's medical information to Social Security.

61.     A June 3, 2008 SOAP note indicates that Mses. Kolodin and DeGroot agreed to withhold two file review reports from Social Security with no explanation why and no indication of which reports.

10

62.     On June 24, 2008, the day Prudential had promised a decision, it sent file information to RRS requesting for a review of the records by a doctor who specialized in occupational medicine and answers to a series of questions.

63.     On June 24, 2008, Prudential sent a letter to Ms. Stanczyk indicating that it was unable to complete the appeal review with the information it had and that it was obtaining additional clarification. Prudential indicated that it hoped to have a determination made by July 15, 2008. The letter made no mention of the additional file review.

64.     On June 30, 2008, Prudential received the RRS report by Dr. Paul Darby, which indicated: Ms. Stanczyk was functionally impaired from September 13, 2006 forward; Ms. Stanczyk would use a walker or cane when walking in the event of a pre-syncopal episode and would work near a restroom; these restrictions are permanent; and Ms. Stanczyk's condition will not likely improve and may worsen. The disability type listed on the report was "unspecified" rather than "own occupation." Dr. Darby stated he reviewed the medical records of Dr. Pryba through April 20, 2007 and Dr. Barboi through February 1, 2007.

65.     On July 15, 2008, Prudential asserted that it had all the necessary reports, that it would have one of its Medical Directors review the file, and that a decision would be made by August 19, 2008.

66.     A July 15, 2008 SOAP note from Ms. Kolodin referred the reviewing Medical Director to review whether Ms. Stanczyk suffered a loss as a result of side effects from taking Topomax from November 2006 until June 2007.

11

67. **A July 17, 2008 SOAP note from Dr. Omowunmi Osinubi, Medical Director,** reported that Ms. Stanczyk suffered no loss as a result of taking medications noting a normal neuropsych evaluation, yet stated that Ms. Stanczyk had "cognitive impairment with memory and dizziness" on December 7, 2006 and March 15, 2007. The note continued: "She reports continued difficulty with cognitive function. She will get confused about certain circumstances or who people are. She is forgetful at times. She is a CPA but she is worried about this change in her level of functioning." Dr. Osinubi further claimed that based on the trips she had taken she had normal/above normal cognitive ability, contrary to what the other doctors said. The note did not indicate Ms. Stanczyk's condition on any of the cited trips. Dr. Osinubi stated that the prognosis for Ms. Stanczyk's return to work was good, as there was no demonstrable neurological or cognitive impairment that could limit sedentary work, which appears at odds with the RRS report. Dr. Osinubi further asserted that Ms. Stanczyk "appears to have made a life style choice after she took six months off work to assist her mother who underwent cardiac surgery."

68. On or about July 24, 2008, Prudential upheld its termination of Ms. Stanczyk's benefits.

69. On or about January 28, 2009, Ms. Stanczyk appealed Prudential's decision to uphold the termination of her benefits.

70. **In reconsidering its denial, Prudential asked MLS to have Dr. McIntyre reconsider his opinions.**

71. **On March 4, 2009, Dr. McIntyre reported that the information provided did not alter his March 26, 2008 opinions. Prudential failed to provide Dr. McIntyre with**

12

updated medical records and test results from Froedtert Hospital, treating doctors Barboi and Pryba, and Ms. Stanczyk's new PCP, Dr. Sawasky.

72.     **On March 13, 2009, Susie Anderson wrote Ms. Stanczyk claiming to need an extension of the March 16, 2009 deadline to decide the appeal.**

73.     **On March 19, 2009, Ms. Anderson sent additional information to RRS for Dr. Darby to review and comment.**

74.     **On March 24, 2009, Prudential received Dr. Darby's response, which claimed no objective evidence to change his opinion. However, in answering whether Ms. Stanczyk was capable of performing employment and daily living activities, Dr. Darby indicated she was not capable because of autonomic neuropathy and POTS.**

75.     On or about April 22, 2009, Prudential reversed its decision and approved Ms. Stanczyk's claim for long-term disability benefits on the basis that, "[t]he effects of autonomic neuropathy and POTS, impair her ability to perform her occupational duties or activities of daily living in a predictable and sustainable manner."

76.     **During the period Ms. Stanczyk was receiving benefits, Prudential missed multiple direct deposit payments and Ms. Stanczyk had to call to get payment sent via check.**

77.     **On May 13, 2010, Danielle Mulligan requested Ms. Stanczyk complete an Activities of Daily Living Questionnaire ("ADLQ") and medical authorization forms by August 11, 2010.**

78.     **On August 2, 2010, Ms. Stanczyk informed Prudential that her doctors included Dr. Barboi, Dr. Sawasky, her PCP, and Dr. Goldblatt, her gastric bypass surgeon,**

13

on an Activities of Daily Living Questionnaire ("ADLQ"). She completed the requested medical authorization forms.

79.     **Ms. Stanczyk and her family moved from Brookfield, Wisconsin to Cedar Rapids, Iowa in September of 2010.**

80.     On September 28, 2010, Prudential placed Ms. Stanczyk under surveillance and she was observed away from her home between 7:28am and 7:58am to drop off two children at school and drive through a Starbucks before returning home, total time 30 minutes. Ms. Stanczyk left her home again at 11:13am. She made 5 different stops before returning home at 1:48pm and remaining home the rest of the day. In total, Ms. Stanczyk was only away from her home for approximately 3 hours. Prudential's surveillance summary falsely reported this information. During the time Ms. Stanczyk was away in the afternoon, the surveillance team observed her walking to and from her car, carrying a small box of indeterminate weight and eating lunch. Nothing Ms. Stanczyk did was contrary to her restrictions.

81.     Prudential's surveillance continued on September 29, 2010, when Ms. Stanczyk was observed between 7:25am and 7:58am taking her children to school, getting gas and making a stop at a coffee shop drive-thru before returning home. Ms. Stanczyk remained at home for nearly 4 hours before she left again at 12:15pm to pick up her children from school on an early release day. She and her daughters attempted to do some shopping at Kohl's on this afternoon but Ms. Stanczyk could not continue due to her medical conditions so she was away from her home that afternoon for approximately 2 hours. Prudential's surveillance summary falsely reported this information.

82.     During Prudential's continued surveillance on October 1, 2010, Ms. Stanczyk was observed leaving her home at 10:29 a.m. with family members. She went to a coffee shop driv-

14

thru, then to a restaurant. Ms. Stanczyk and her companions also went to a store, however Ms. Stanczyk was observed fewer than 10 minutes in the store before she returned to the car because of her medical conditions. Ms. Stanczyk's activities away from her home totaled 4 hours, after which she spent the remainder of the day at her residence. Prudential's surveillance summary falsely reported this information.

83.     None of Ms. Stanczyk's activities during the 2010 surveillance were contrary to her stated restrictions and limitations.

84.     Ms. Stanczyk's taking her children to school, eating lunch in a public place, and doing small errands did not indicate an ability to perform full-time work as a CPA/Independent Consultant.

85.     Following this surveillance footage, Prudential took no steps to have Ms. Stanczyk's benefits terminated.

86.     **On February 10, 2011, Ms. Stanczyk informed Prudential that her new PCP was Dr. Karen Harmon.**

87.     **On April 21, 2011, Prudential wrote to Ms. Stanczyk acknowledging that Dr. Harmon was her new PCP.**

88.     **On June 2, 2011, Ms. Stanczyk provided Danielle Mulligan, district claims manager ("DCM"), with a three page summary of her status and that her new PCP was Dr. Harmon.**

89.     **On February 27, 2012, Dr. Barbara Parke conducted a Prudential capacity/clinical review, documenting her conclusion in SOAP notes. None of Ms. Stanczyk's medical records were requested or obtained from Dr. Barboi, her past PCPs**

15

between March 13, 2007 to January 1, 2010, or from her current PCP, Dr. Harmon. Dr. Parke relied extensively on file review opinions to reach her conclusions.

90.     On March 7, 20 and 21, 2012, Prudential had surveillance performed on Ms. Stanczyk.

91.     On March 7 and March 21, 2012 the surveillance teams watched Ms. Stanczyk's residence for 5-6 hours before abandoning surveillance due to a lack of activity.

92.     On March 20, 2012, Ms. Stanczyk was observed taking her children to school, stopping at a copy shop for about 3 minutes, going to a coffee shop drive-thru and in an office building until about 1:00 p.m. When Ms. Stanczyk left the office building she went to a fast-food drive-thru and returned home. Approximately an hour later, Ms. Stanczyk left her home again to pick up her high school daughter and returned home.

93.     During the approximate 5 hours that Ms. Stanczyk was "in an office building", she was at the American Cancer Society volunteering to help with their preparation for their annual Gala. Ms. Stanczyk had previously reported to Prudential that she tries to volunteer in areas where she can perform her volunteer work primarily from home and can do it at her own pace. Ms. Stanczyk was also able to change positions, lie down if necessary, and could pace herself.

94.     **On September 20, 2012, SOAP notes indicated that Suzanne Posey, TL, Ms. Mulligan, and Crissy Gambrell, DCS, reviewed the claim and concluded Ms. Stanczyk's capacity had improved to a level of sustainable sedentary capacity as of March 2012, despite not having the records of Dr. Harmon. Msses. Posey, Mulligan, and Gambrell decided to get the records of Dr. Tallman and if there was no change to terminate Ms.**

Stanczyk's benefits. This decision was based on the surveillance that occurred in September and October 2010 and March 2012.

95.　　Both the October 2010 and March 2012 surveillance was summarized by Prudential's John Sloth and repeated in the SOAP notes by Ms. Mulligan. Mr. Sloth's summary, which was used by Ms. Mulligan, was inaccurate because of errors in calculating the time Ms. Stancyzk was away from home and the gait with which she walked. Neither of the summaries specified which activities were contrary to those Ms. Stanczyk reported in her July 10, 2010 ADLQ.

96.　　In Mr. Sloth's summary following the March 2012 surveillance, reported that the two surveillances provided a great deal of documentation to show Ms. Stanczyk was active and capable of performing activities contrary to her self reported limitations and restrictions. Again, the summary did not specify the contrary activities to those reported by Ms. Stanczyk in her 2010 ADLQ and the update in June 2, 2011.

97.　　These false characterizations of the surveillance became a permanent part of the file and other claim personnel relied on those notes in their review of the file including: Ms. Posey on September 12, 2012; Sandra Kraemer on July 10, 2013; Sarina Butera on August 15 and 21, 2013.

98.　　Ms. Stanczyk corrected the false characterizations in her appeal dated December 13, 2013, but Prudential did not correct the reports and repeatedly used the reports to deny Ms. Stanczyk's benefits.

99.　　On February 21, 2013, Ms. Mulligan wrote Ms. Stanczyk claiming that the medical records of Dr. Tallman indicated that she could perform her job. At this point, Prudential had still not received the records of Dr. Harmon.

17

100.    **On February 26, 2013, Ms. Stanczyk wrote Prudential, again identifying Dr. Harmon as her PCP.**

101.    Ms. Stanczyk completed an Activities of Daily Living Questionnaire at Prudential's request on March 30, 2013. Her reported activities and limitations were consistent with all of her prior reports of activities of daily living and supported her claim of disability.

102.    Ms. Stanczyk's medical conditions and symptoms that rendered her disabled according to their approval of benefits in 2009 had not changed.

103.    Ms. Stanczyk's reported activities and limitations were consistent with Prudential's surveillance of her.

104.    **On April 2, 2013, Ms. Stanczyk *faxed* a letter again identifying Dr. Harmon as her PCP and a completed daily living questionnaire after Ms. Mulligan threatened to make a final decision if it was not received. Ms. Stanczyk explained her treatment with Dr. Tallman and that Ms. Mulligan was again selectively interpreting portions of the records to set up a denial of her benefits.**

105.    **In a May 15, 2013 SOAP note, Brett Lee, the new DCM, noted that Dr. Harmon was Ms. Stanczyk's PCP and that Dr. Harmon's files were not in the file nor were they considered during the plan for termination of Ms. Stanczyk's benefits.**

106.    On June 10, 2013, Ms. Stanczyk's treating physician, Dr. Harmon, completed a Capacity Questionnaire opining that Ms. Stanczyk cannot work, supported by detailed restrictions and limitations of no climbing ladders or repetitive stooping, kneeling; no sitting > 1°; no standing > 1°; and frequent position changes.

107.    **On July 26, 2013, Mr. Lee requested an internal medicine review and answers to questions posed from MCMC. Question 3, detailed in a SOAP note, asked,**

18

"What is the claimant's prognosis for recovery to return to her regular occupation as a CPA (light)?"

108.     **On August 14, 2013, Dr. Lucien Parillo submitted a report that included a different Question 3 that made no mention to Ms. Stanczyk's occupation. Dr. Parillo's report stated Ms. Stanczyk had no physical limitations that were medically necessary and supported by the clinical evidence, nor did she have a functional impairment and she could work fulltime from July 31, 2013 forward. As part of his review, Dr. Parillo relied on the erroneous summary of the surveillance by Mr. Sloth. Dr. Parillo also falsified the June 30, 2013 report of Dr. Harmon claiming it said that Ms. Stanczyk could perform work at a sedentary level.**

109.     Prudential terminated Ms. Stanczyk's long-term disability benefits pursuant to a letter dated August 21, 2013 stating that she no longer met the definition of Total Disability.

110.     **The termination letter, written by Sarina Butera, indicated the termination of benefits was to be effective August 1, 2013.**

111.     **A SOAP note by Ms. Butera on August 21, 2013 stated: "AP notes does not have F/T or P/T capacity" but neither Ms. Butera nor Prudential management reviewed Dr. Parillo's report carefully enough to identify his mistake and question his conclusions.**

112.     Prudential's termination of benefits was purportedly based on the surveillance of Ms. Stanczyk nearly three years earlier, on September 28, 29 and October 1, 2010.

113.     Prudential purportedly relied on Ms. Stanczyk's Facebook postings to terminate her disability benefits.

19

114. Prudential's administrative record shows that Ms. Stanczyk has good and bad days. Her condition waxes and wanes in its severity, and on her good days she wants to be an active participant in her own life.

115. None of the Facebook postings involved a full day of activity. Ms. Stanczyk was able to sit as needed, she was able to be near a restroom, there was minimal walking, and she always had the option to return to her car to recline and rest if necessary. **The surveillance showed Ms. Stanczyk leaving activities abruptly in order to alleviate her symptoms.** There is nothing inconsistent with her claim for disability in an isolated day of activity where Ms. Stanczyk was at all times in control of her participation, pace, and need for rest.

116. Her ability to use a computer, post pictures and status updates on Facebook, and share with family and friends the positive things in her life are not evidence that she could perform full-time work as a CPA/Independent Consultant.

117. On or about December 20, 2013, Ms. Stanczyk appealed Prudential's August 21, 2013 decision to terminate her long-term disability benefits.

118. **Prudential acknowledged Ms. Stanczyk's appeal 26 days later on January 15, 2014. In SOAP notes dated the same day, yet another claim person, Susan Schulz noted that "Dr. Harmon (PCP) provided for sedentary occupation," which was contrary to Ms. Brutera's August 21, 2013 note and Dr. Harmon's capacity questionnaire. Upon information and belief, Ms. Schulz retrieved this information from Dr. Parillo's erroneous report.**

119. **Ms. Schulz's mistake was repeated in subsequent notes created on March 26, 2014, April 25, 2014, and October 2, 2014.**

120. **On February 10, 2014, Ms. Stanczyk submitted even more medical information and articles supporting her diagnosis and disability.**

121. **On March 14, 2014, Dr. Mark Burns submitted a report for Prudential concluding that Ms. Stanczyk had medically necessary restrictions of lifting, carrying, pushing, and pulling up to 20 pounds. Dr. Burns further stated that defining the nature, causes, and degree of impairment as well as Ms. Stanczyk's diagnoses was difficult because he had no expertise as to her psychiatric, cardiologic, neurological problems.**

122. On or about March 26, 2014, Prudential upheld its decision to terminate Ms. Stanczyk's disability benefits on the basis that (1) a June 2011 neurology evaluation did not find signs of autonomic dysfunction correlated with any symptoms; (2) no cardiac, GI, psychological, or psychiatric follow up; and (3) there is insufficient documentation of restrictions and limitations that would prevent Ms. Stanczyk from performing the material and substantial duties of her own occupation.

123. On or about June 23, 2014, Ms. Stanczyk underwent an independent medical examination by Randal F. Wojciehoski, D.P.M., D.O.

124. On July 8, 2014, Dr. Wojciehoski issued a report stating his opinion to a reasonable degree of medical probability considering all the factors provided as well as comprehensive review of the extensive medical records that Ms. Stanczyk does suffer from significant disability secondary to her small fiber autonomic dysfunction, postural orthostatic tachycardia syndrome, Ehlers-Danlos syndrome, chronic fatigue and chronic pain syndrome, which render her completely and totally disabled as a certified public accountant and certified public accountant consultant. Ms. Stanczyk's required balance between activity and sitting in

21

order to accommodate her medical conditions, are clearly juxtaposed in terms of treatment and activity restrictions.

125.     Dr. Wojciehoski opined in his July 8, 2014 report that Ms. Stanczyk's conditions do lead to functional limitation most consistent with minimal sedentary work at her own discretion which would be assessed on a limited basis throughout the day. Dr. Wojciehoski recommended that Ms. Stanczyk not perform physical tasks such as lifting, reaching, bending, stooping and carrying items; she has been able to self-limit her physical activities in order to prevent orthostasis and tachycardia; she has been disabled since 2006 and is also markedly deconditioned.

126.     Dr. Wojciehoski opined in his July 8, 2014 report that as a consultant, the demands of the job include rigorous travel and long hours that Ms. Stanczyk is unable to meet due to mind-altering drugs including Tramadol and Trazodone, as well as an element of psychological impairment and cognitive impairment. Despite the fact that in 2007 Ms. Stanczyk had a normal neuropsychological evaluation, it appears that her cognitive function has diminished, Dr. Wojciehoski concluded.

127.     On or about September 19, 2014, Ms. Stanczyk appealed Prudential's decision to uphold the termination of her benefits.

128.     On or about September 30, 2014, Ms. Stanczyk provided Prudential with supplemental medical records from her treating doctors containing clinical evidence of her disabling medical conditions, including Ehlers-Danlos Syndrome (hypermobility form), chronic low back pain, POTS, neck pain and constant paresthesia.

129.     On or about October 13, 2014, Ms. Stanczyk provided Prudential with the Case Analysis from Ms. Stanczyk's Social Security file which shows that Social Security based its

Case 1:15-cv-00097-CJW   Document 42-2   Filed 09/08/16   Page 22 of 30

decision on evidence of Ms. Stanczyk's small fiber polyneuropathy and autonomic dysfunction, including her symptoms of dizzy spells and fatigue, as well as the letter from Dr. Barboi outlining her medical condition, treatment and inability to maintain consistent function. Based on the medical evidence, Social Security found Ms. Stanczyk's condition equaled the intent of Listing 11.14 as of June 6, 2006 due to autonomic dysfunction and small fiber polyneuropathy with symptoms of fatigue, tachycardia and near syncope.

130.    Social Security concluded Ms. Stanczyk is unable to perform substantial gainful activity and relied on the same medical evidence available to Prudential to reach this conclusion.

131.    Prudential conducted surveillance of Ms. Stanczyk during 2014 and observed behavior consistent with her reported limitations and supportive of her disabling conditions.

132.    **On November 5, 2014, yet another new claim person, Kevin Carder, without reason, claimed that more time was needed to decide Ms. Stanczyk's appeal and that a decision would be made by December 20, 2014.**

133.    **On November 17, 2014, Mr. Carder sent letters to RRS to have a physical medicine and rehabilitation review with questions performed by Dr. Denise Davis and to have an occupational medicine review with questions performed by Dr. Rea. The requests and subsequent reports used the incorrect "any occupation" definition as opposed to the "own occupation" definition provided in Ms. Stanczyk's policy.**

134.    **On December 9, 2014, Ms. Stanczyk submitted the updated records of Dr. Harmon.**

135.    **On December 10, 2014, Dr. Davis submitted a report, which used the incorrect "any occupation" definition as opposed to the "own occupation" definition in Ms. Stanczyk's policy, with the following opinions: there were medically necessary limitations**

from August 1, 2013 forward; her opinions differed from those of Drs. Burns and Parillo; and the reports of Drs. Defilippis and Darby were of no use to her because they were six years old.

136.     **On December 16, 2014, Mr. Carder claimed an extension until January 19, 2015 on the appeal decision was necessary to answer questions from Drs. Harmon and Kim.**

137.     **On December 17, 2014, Dr. Davis submitted another report based on the incorrect "any occupation" basis.**

138.     **On December 22, 2014, Dr. Kim submitted answers to the questions posed by Prudential.**

139.     **On January 5, 2015, Dr. Davis responded that since August 1, 2013, Ms. Stanczyk's fibromyalgia and autonomic dysfunction caused the following work restrictions: sitting for eight hours per day, with changing positions every hour for comfort; standing/walking for six out of eight hours with changing positions every hour for comfort; and other restrictions.**

140.     On or about January 12, 2015, Prudential issued its final decision to deny Ms. Stanczyk's long-term disability benefits.

141.     **In denying Ms. Stanczyk's benefits, Mr. Carder relied upon the surveillance conducted on Ms. Stanczyk, Dr. Davis's report, and the same inaccurate information relied upon by Ms. Schulz regarding the opinion of Dr. Harmon in denying Ms. Stanczyk's appeal. Upon information and belief, Mr. Carder did not review Dr. Harmon's June 10, 2013 capacity questionnaire nor her September 19, 2014 report, which supported Ms. Stanczyk's total disability.**

24

142.     Ms. Stanczyk's symptoms have not changed from June 2006 to present, and render her unable to perform as a CPA/Independent Consultant.

143.     During the appeal process, Ms. Stanczyk submitted complete medical documentation and verification of her medical disability to Prudential.

144.     Ms. Stanczyk has provided all information requested by Prudential regarding her claims under the Plan.

145.     **Prudential requested tax returns from Ms. Stanczyk which became part of the claim file and violated her privacy.**

146.     Prudential has failed to provide a detailed explanation as to why it rejected the specific evidence in Ms. Stanczyk's file that shows she is disabled.

147.     **Prudential failed to consider that Ms. Stanczyk received SSA benefits or the SSA's analysis of her disability.**

148.     **Prudential failed to adequately explain why it would be harder to obtain Ms. Stanczyk's own-occupation benefits than SSA's benefits under a more strigent definition of disability.**

149.     Prudential has failed to provide a description of any additional material or information necessary for Ms. Stanczyk to perfect her claim.

150.     Prudential has failed to provide an explanation why any such additional information or material would be necessary.

151.     Prudential ignored clear medical evidence of Ms. Stanczyk's medical conditions and disability in denying Ms. Stanczyk's claim under the Plan.

25

152.    There was no reasonable basis for Prudential's denying Ms. Stanczyk's claim for benefits under her Plan and Prudential, in denying the claim, either knew or recklessly failed to ascertain that the claim should have been paid.

153.    **Prudential conducted its investigation with an aim toward limiting the duration for which benefits would be covered by searching for mental health reasons for her disability rather than focusing on coverage for her medical conditions.**

154.    Ms. Stanczyk's claim was not properly investigated and the results of the investigation were not given a reasonable evaluation and review.

155.    **Prudential failed to obtain and provide relevant medical records prior to obtaining internal and external file reviews.**

156.    **Prudential failed to correct errors in the summarization and characterization of the surveillance and did not correct them in their internal records and, even worse, did not correct the information previously given to file reviewers to amend their opinions and also continued to provide erroneous information to new file reviewers.**

157.    None of Prudential's reviewers ever saw Ms. Stanczyk or spoke to her.

158.    **None of Prudential's reviewers or claim managers spoke with Dr. Talman but relied extensively on office visit notes from Ms. Stanczyk's one visit to him in June of 2011 as a purported basis to terminate her benefits in August of 2013.**

159.    Prudential refused to consider Ms. Stanczyk's claim for damages and conducted its investigation in such a way as to prevent it from learning the true facts upon which Ms. Stanczyk's claim is based.

160.    Prudential's denial of Ms. Stanczyk's disability benefits was done with intentional disregard for the rights of Ms. Stanczyk.

Case 1:15-cv-00097-CJW   Document 42-2   Filed 09/08/16   Page 26 of 30

161. No lawful basis for Prudential's refusal existed because of its intentional, reckless, or negligent failure to investigate or evaluate Ms. Stanczyk's claim.

162. There was no objectively reasonable basis for Prudential to not pay Ms. Stanczyk's claim. **Any reasonable person reviewing the objective medical documentation of the Ms. Stanczyk's conditions and symptoms and the unequivocal opinions of the treating doctors would conclude that her claim was valid.**

163. **Prudential's biased and slanted investigation was intentially done with focused goal of denying benefits and not the industry goal of trying to find coverage. Prudential searched for ways to deny coverage and then supported that unreasonable goal with false and fraudulent statements.**

164. **Prudential did not give Ms. Stanczyk's interest at least as much thought or consideration as its own in evaluating the claims or the amounts paid or not paid.**

165. **Prudential refused to provide the claim file in electronic form to aid in her appeal and it did not provide the surveillance videos until after the final appeal on January 15, 2015, thus not allowing the Insured to rebut Prudential's characterization.**

166. **Prudential showed retaliation for the Insured's declaration in the Leeper-Johnson case.**

167. **Prudential was paying benefits and it did not have affirmative medical evidence that showed an improvement in Ms. Stanczyk's conditions and disabling symptoms before it terminated her benefits.**

168. **Prudential was previously found by various courts to have acted in bad faith in similar cases to Ms. Stanczyk but did not change their pattern and practices which resulted in a bad faith handling of her claim and ultimate denial of Ms. Stanczyk's benefits.**

27

169.     **The same personnel involved in the Leeper-Johnson v. Prudential case had a significant role in evaluating the claim and denying benefits to Ms. Stanczyk.**

170.     **Prudential forced Ms. Stanczyk to sue in order to receive covered benefits.**

171.     **Prudential's management subjected Ms. Stanczyk to a pattern and practice of unreasonable claim handling. Prudential's management accepted the unreasonable conduct of their personnel, as evidenced by the failure to intercede in a recognizable pattern of wrongful conduct. Such conduct included Prudential's management allowing false statements by employees to occur and go uncorrected in both internal and external reports; allowing claim personnel to obtain file reviews without all pertinent medical records; allowing inaccurate statements of file reviewers to go uncorrected by claim personnel and allowing unreasonable delays in claim handling process for the initial claim and the four appeals.**

172.     Prudential's denial of Ms. Stanczyk's disability benefits has caused her to suffer substantial damages including a physical toll; loss of benefits; severe emotional distress; financial strain; and expenses--all to her damage.

## FIRST COUNT
## BAD FAITH BY INSURANCE COMPANY: ASSURED'S CLAIM

173.     As and for a first claim for relief, Ms. Stanczyk re-asserts the allegations recited above and fully incorporates those paragraphs herein by reference.

174.     The allegations more particularly described above constituted bad faith by Prudential in processing and denying Ms. Stanczyk's claim for disability benefits due to her under the terms of the Plan.

175.     Ms. Stanczyk's claim is not fairly debatable and Prudential is not entitled to debate it.

28

## SECOND COUNT
## TORTIOUS BREACH OF CONTRACT

176.    As and for a second claim for relief, as an alternative to the first and third claims relief, Ms. Stanczyk re-asserts the allegations recited above and fully incorporate those paragraphs herein by reference.

177.    The allegations more particularly described above involved a separate intentional wrong by Prudential, which resulted from its breach of duty imposed as a consequence of Ms. Stanczyk's insurance contract.

## THIRD COUNT
## BREACH OF CONTRACT

178.    As and for a third claim for relief, as an alternative to the first and second claims for relief, Ms. Stanczyk re-asserts the allegations recited above and fully incorporates those paragraphs herein by reference.

179.    The allegations more particularly described above constituted violations of Iowa common-law by Prudential in breaching its contract with Ms. Stanczyk to pay disability benefits upon her inability to perform the material and substantial duties of a CPA/Independent Consultant, causing Ms. Stanczyk to suffer, without limitation, a loss of the benefits of her bargain.

WHEREFORE plaintiff, Amy Stanczyk, demands relief as follows:

A.    Judgment against the defendant awarding Ms. Stanczyk present value, lump-sum award of benefits under the disability insurance Plan;

B.    Judgment against the defendant awarding Ms. Stanczyk her costs, disbursements, prejudgment interest, actual attorney's fees and expert witness fees incurred in prosecuting this claim, together with interest on said fees;

29

C. Judgment against the defendant awarding Ms. Stanczyk punitive damages in amount deemed sufficient by the trier of fact to punish and deter Prudential from such unlawful conduct now and in the future;

D. Judgment against the defendant awarding Ms. Stanczyk the damages she has suffered as a consequence of Prudential's denial of her disability benefits;

E. Judgment against the defendant awarding Ms. Stanczyk damages compensating her for emotional distress, physical pain and related medical expenses, loss of enjoyment, invasion of privacy and humiliation she has suffered as a result of Prudential's denial of her disability benefits; and

F. Such other relief as the Court deems just and equitable.

Dated this 8th day of September, 2016.

s/ Alan C. Olson
Alan C. Olson, WI Bar No.: 1008953
Attorney for Plaintiff
Alan C. Olson & Associates, S.C.
2880 S. Moorland Rd.
New Berlin, WI 53151
Telephone: (262) 785-9606
Fax: (262) 785-1324
Email: AOlson@Employee-Advocates.com

Mark J. Seidl
Seidl & Seidl, PLC
229 Northland Ct. NE
Cedar Rapids, IA 52402

30